IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VICTOR B. [1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-cv-00342-CJP[2] |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Victor B. (Plaintiff) seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for DIB and SSI on March 11, 2013, alleging a disability onset date of August 4, 2011. (Tr. 203-13). The Agency denied Plaintiff's application at the initial level, and again upon reconsideration. (Tr. 92-138). After conducting an evidentiary hearing, (Tr. 28-91), Administrative Law Judge (ALJ) Joseph L. Heimann also reached an unfavorable decision. (Tr. 9-22). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final agency

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect his privacy. See, FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). See, Doc. 27.

decision. (Tr. 1-3). Plaintiff exhausted his administrative remedies and filed a timely Complaint with this Court. (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff asserts the ALJ's Residual Functional Capacity assessment was erroneous because the ALJ:

- "played doctor" in analyzing the medical evidence,

-  "cherry-picked" from the record,

- erroneously disregarded a state agency consultant's opinion,

- erred in assessing Plaintiff's complaints of pain, and

- impermissibly discredited the testimony of Plaintiff's sister.

## Applicable Legal Standards

To qualify for SSI and/or DIB, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573

F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court

uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The ALJ's Decision

ALJ Heimann followed the five-step analytical framework set forth above. (Tr. 9-22). He determined that Plaintiff met the insured status requirements through December 31, 2016 and had not engaged in substantial activity since August 4, 2011, the alleged onset date. (Tr. 11). Plaintiff had severe impairments of status post tendon rupture repair of the left ankle with retrocalcaneal bursitis of the left ankle, and lumbar degenerative disc disease. (Tr. 12). The ALJ opined Plaintiff had the RFC to perform light work with several additional limitations, (Tr. 14), and was unable to perform any past relevant work, (Tr. 20). However, Plaintiff was able to perform other jobs that existed in significant numbers in the national economy and, therefore, was not disabled. (Tr. 20-21).

<u>**The Evidentiary Record**</u>

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

## 1. Agency Forms

In his agency reports from 2013, plaintiff alleged that the following conditions limited his ability to work: retrocalcaneal bursitis; depression; residuals of a left Achilles tendon tear and three associated surgeries; chronic severe pain and swelling in his lower left leg, ankle, and heel; and lumbago. (Tr. 237).

Plaintiff's highest degree of education was twelfth grade. He also graduated from the Missouri Law Enforcement Academy. (Tr. 238). He previously worked as a corrections officer, custodian, railroad conductor, security officer, and truck driver. (Tr. 239). In August 2011, Plaintiff was injured at work and underwent three surgeries. He participated in therapy for a total of nine months. Plaintiff experienced constant pain in his lower left heel and ankle. (Tr. 277).

Plaintiff indicated that he could not walk longer than one to two hours without excruciating pain in his lower left ankle and heel. (Tr. 270). He could not stand for long periods, jog, or ride a bike without experiencing pain. His pain sometimes interfered with his sleep. (Tr. 271). He tried to avoid stairs, lifting, squatting, and kneeling, because those activities irritated his Achilles injury and his lower ankle and heel. He could walk for about thirty minutes before needing to rest five to ten minutes at a time. (Tr. 275). Plaintiff used prosthetics and a

cane, which were prescribed by his doctor after his third surgery in November 2011. He used them "as needed," which was mostly after he was on his feet for longer than a couple of hours. (Tr. 276).

Plaintiff's girlfriend prepared all of his meals, but he completed laundry and ironing once a week. (Tr. 272). He did not do any other house or yard work because it put too much pressure on his lower left leg and ankle. (Tr. 273). Plaintiff could drive and ride in a car. (Tr. 273). He seldom grocery shopped due to financial problems and "constant annoying pain." (Tr. 273). Plaintiff attended church twice each month. (Tr. 274). He did not socialize as much as he used to because of pain. (Tr. 275).

Throughout a typical day, plaintiff knelt to pray, showered, ate breakfast, attended summer school, came home, studied, sat down to relax his legs, ate dinner, watched television, and went to bed. (Tr. 271).

### 2. Evidentiary Hearing

ALJ Heimann presided over an evidentiary hearing that took place in January 2016. (Tr. 28-92). Plaintiff stated he lived with his girlfriend, who washed his laundry, cooked, and grocery shopped. Plaintiff sometimes washed dishes, swept, and vacuumed. He hired a lawn service to take care of the yard work. (Tr. 36).

Plaintiff was working as a janitor for a school district in August 2011 when he was injured. He underwent surgery that same month. One of Plaintiff's doctors released him at maximum medical improvement (MMI) in July 2012 and opined

he could return to full duty work without restrictions. Plaintiff's other physicians, however, advised Plaintiff not to return to work and placed him on 30-minute sitting/standing restrictions. Plaintiff ultimately went back to work as a janitor shortly thereafter and was expected to perform his custodial duties in a wheelchair. Plaintiff was terminated in November 2012. (Tr. 40-44).

Plaintiff attended community college from 2013 to 2015 and completed 48 credit hours of an HVAC program. He needed about 20 more hours to earn the degree but quit because he wanted to help his girlfriend's family open an adult daycare center. Plaintiff drove a passenger bus for the center to transport the seniors to and from the facility. He sporadically took the seniors to doctor appointments and to run errands. (Tr. 36-40). Plaintiff enrolled in the HVAC program despite knowing he could not be on his feet all day because he was "desperate" and had no income. (Tr. 47).

Plaintiff experienced constant pain in his back and legs. He did not think he could perform a job that required eight-hours of sitting because of pain. Plaintiff took Ibuprofen for his symptoms. His doctors prescribed Hydrocodone and Oxycodone but he did not want to take any addictive medication because of his history with substance abuse. (Tr. 46-52). Plaintiff also stretched and stood up to alleviate his pain and occasionally used a TENS Unit. (Tr. 58).

Plaintiff could no longer walk long distances, ride a bike, or climb stairs. He lost his three-story townhouse because he could not walk up and down the stairs. (Tr. 60). He spent 80% of his day lying down with his feet up. (Tr. 62).

Plaintiff's sister, Veronica, also testified at the hearing.  She saw her brother once every six months from 2011 to 2013 because she did not live close to him.  However, she moved back to St. Louis in 2013 and at the time of the hearing she saw Plaintiff every day.  Veronica stated that Plaintiff's injury affected him emotionally, psychologically, physically, and financially.  Plaintiff always seemed uncomfortable and had to stand up and move around due to pain.  She believed he would be an unreliable employee because of his conditions; he would constantly be off task because of pain and mental distress.  Plaintiff sometimes cried and was withdrawn. (Tr. 62-69).

### 3. Medical Records

On August 4, 2011, Plaintiff was working as a custodian at a school, pushing cabinets, when he felt an acute pop and pain in the posterior aspect of his left ankle.  He visited the Veterans Assistance (VA) Hospital on August 5, 2011 and was diagnosed with an Achilles tendon rupture. (Tr. 328).  Plaintiff underwent an open Achilles tendon repair on August 8, 2011. (Tr. 507-11).  He was discharged that same day and instructed to remain non-weightbearing on the lower left extremity. (Tr. 1063).  Plaintiff's wounds became infected following surgery and he underwent an irrigation and debridement on August 22, 2011. (Tr. 504-06).  Plaintiff underwent a second irrigation and debridement on August 26, 2011. (Tr. 502-04).  He was discharged on August 29, 2011 with Cafepime, Norco, Oxycodone, Vancomycin, and Aspirin.  He was instructed to remain non-

weightbearing at all times, keep his leg elevated, and follow up with the Orthopedic Clinic in a week. (Tr. 712-13).

Following his surgeries, Plaintiff participated in physical therapy, occupational therapy, and work conditioning, utilized a chiropractor, and received interlaminar steroid injections for back pain. He also received treatment for mood disorders related to his physical disabilities but demonstrated minimal depressive symptoms during evaluations and eventually decided to terminate treatment because he felt he could cope with any future stressors independently. (Tr. 807-09). Plaintiff also frequently followed-up with Dr. Gary Miller, his orthopedic surgeon, and Dr. Lawrence Evans, another orthopedist at the VA.

Plaintiff saw Dr. Miller on October 20, 2011 and complained of lower back pain that began shortly after his surgery, following his use of crutches. Plaintiff had been wearing a moonboot and lumbosacral brace but was no longer using crutches or a cane. Dr. Miller opined Plaintiff's Achilles was healed and his back pain was likely the result of altered mechanics, although there might have been other potential causes. There were no root tension signs or indication he suffered a herniated disk. Dr. Miller ordered images of Plaintiff's lumbosacral spine, physical therapy, and a TENS unit, and suggested Vicodin. Plaintiff declined the Vicodin and Dr. Miller prescribed Cyclobenzaprine and Xylocaine. (Tr. 922-24).

Plaintiff had an MRI of his lumbar spine on November 14, 2011. The radiologists noted minimal degenerative disc disease at L4-L5 and multilevel

bulging discs and facet joint osteoarthropathy resulting in narrowing of the spinal canal and neuroforamina. (Tr. 514-16).

Plaintiff followed up with Dr. Miller on November 17, 2011. He began physical therapy a week before, wore the brace, and used the TENS unit. Dr. Miller reviewed the MRI and opined Plaintiff had degenerative disc disease at several levels, especially L4-L5 with bulging but not herniated discs. (Tr. 914-15).

Plaintiff saw Dr. Miller on November 22, 2011 and continued to report back pain. Plaintiff was scheduled to be measured for an ankle foot orthotic the following Tuesday. (Tr. 914).

An MRI of Plaintiff's lumbosacral spine from August 5, 2011 showed mild degenerative changes. (Tr. 517-18).

Plaintiff saw Dr. Evans on March 8, 2012 and reported "pain." He had good range of motion (ROM) of his foot and ankle with mild swelling of the distal part of his Achilles' tendon, which was expected. Plaintiff's wound was well healed. Dr. Evans instructed Plaintiff to continue sedentary work and therapy. (Tr. 890).

Plaintiff's chiropractor discharged him from treatment on April 6, 2012. Plaintiff reported that steroid injections he received the previous month helped control his back pain. Plaintiff rated his pain at a 1-2/10. He demonstrated a normal ROM in the lumbar and thoracic regions without pain. (Tr. 498-500).

On May 10, 2012, Dr. Evans noted Plaintiff made gradual improvement. Plaintiff still experienced pain, but his ROM of the ankle improved. Dr. Evans

instructed Plaintiff to continue therapy and gradually increase ambulation as tolerated. (Tr. 497).

Plaintiff followed up with Dr. Miller on July 31, 2012. Plaintiff's Achilles repair was "very strong" but he had some residual weakness of the calf with atrophy, compared to his right. Dr. Miller opined Plaintiff had not yet reached MMI and he instructed Plaintiff to use his brace and cane, and avoid stairs, squatting, and climbing. Dr. Miller also instructed Plaintiff to follow a regimen of 30 minutes of standing and/or walking and 30 minutes of sitting. (Tr. 493-94).

Plaintiff saw Dr. Evans on August 31, 2012. Dr. Evans noted Plaintiff had relatively good ROM of his ankle, although not completely normal. Plaintiff's wound was well healed with some mild thickening and pain to palpation over the retrocalcaneal bursal area. Dr. Evans diagnosed Plaintiff with retrocalcaneal bursitis. He recommended Plaintiff get heel raises in his shoes and begin physical therapy. (Tr. 492).

Plaintiff consulted Dr. Jeremy James McCormick at Washington University Orthopedics on September 22, 2011. There was no sign of infection related to his Achilles surgery. Dr. McCormick instructed plaintiff to remain non-weightbearing for the left lower extremity for another couple of weeks. (Tr. 327-32).

On October 29, 2011, Plaintiff was issued a TENS unit for back pain. (Tr. 634-36).

Plaintiff followed-up with Dr. McCormick on October 26, 2011. He reported mild intermittent discomfort and some swelling. Dr. McCormick noted

improvement and instructed Plaintiff to continue weightbearing to tolerance and ambulating in a boot, and to begin physical therapy. Dr. McCormick also ordered Plaintiff an ankle foot orthotic brace and told him to follow-up in two weeks. (Tr. 322-23).

Plaintiff saw Dr. Miller on December 5 and 22, 2011. His back pain was persistent but mildly improved. The TENS unit was somewhat helpful. Dr. Miller noted that Dr. Evans was impressed with Plaintiff's ankle power. (Tr. 905-10).

Plaintiff saw Dr. Evans on January 26, 2012. He was ambulating well and had no unusual complaints of pain. Plaintiff demonstrated good ROM of his left ankle. Dr. Evans instructed Plaintiff to gradually increase his activities and continue his motion and strengthening. (Tr. 903-04).

Plaintiff followed-up with Dr. McCormick on February 6, 2012. Dr. McCormick examined Plaintiff and diagnosed him with status post Achilles tendon repair with complication that had now gone on to heal. He noted Plaintiff had only improved in his strength and mobility and needed to start physical therapy. Dr. McCormick instructed Plaintiff to return on an as-needed basis. (Tr. 320-21).

Plaintiff consulted Dr. Heidi Prather at Washington University Orthopedics on April 5, 2012. He complained of low back pain but stated steroid injections helped with pain and numbness down his left leg. Plaintiff also reported that physical therapy, manipulation by a chiropractor, a tilt table, an inversion table, and a TENS unit provided little to minimal relief. On examination, Plaintiff

demonstrated limited lateral bending and pain with forward flexion. He had tenderness to palpation on his low back. He had 5/5 strength in his bilateral lower extremities, quadriceps, hamstring, tibialis anterior, gastroc-soleus and EHL. His sensation was intact to light touch bilaterally. Plaintiff demonstrated restricted left greater than right hip flexion, without pain. He also had an antalgic gait. Plaintiff's MRI from the VA demonstrated mild L4-L5 and L5-S1 disc bulge with foraminal degenerative arthritis. Dr. Prather diagnosed Plaintiff with low back pain with lower extremity pain, consistent with radiculopathy. She suggested active therapy and prescribed physical therapy. (Tr. 315-19).

Plaintiff underwent work conditioning three times per week for 10 weeks, and work hardening five days per week for four weeks, from March 15, 2012 through June 28, 2012. He attended a total of 46 sessions. On May 25, 2012, Plaintiff's therapist noted he was able to lift 55 pounds frequently to all levels. (Tr. 1377). According to his work hardening update upon discharge, Plaintiff completed a four wheel cart push with 400 pounds for 105 feet and five repetitions in under three minutes; a two wheel dolly push of 180 pounds for 105 feet and five repetitions in under three minutes; 10 steps in a step over step pattern for 10 repetitions in a step over step pattern without using handrails; a repetitive bending task to 18 inches off the floor for 100 repetition in under three minutes; a repetitive foot pedal pump for one minute with increased discomfort and a 20 scoop shoveling task with a moderate load with no increase in pain; and the incline ladder climb and completed three rungs for five repetitions without

reporting increased discomfort. Plaintiff ambulated without an assistance device. His left lower extremity push off was limited but he was completing a 30 minute walk with an occasional three minute jog at 2.8 miles-per-hour with a two percent incline. Plaintiff climbed a ramp for 10 repetitions with increased left foot pain when ascending the ramp. He tolerated jogging without handrails and increased endurance from a 90 minute program to a three-and-a-half hour program. (Tr. 1371-72).

On August 31, 2012, Plaintiff followed up with Dr. Evans and reported continued problems with his Achilles tendon, primarily with retrocalcaneal bursitis. Dr. Evans noted relatively good ROM of Plaintiff's ankle, although not normal. There was mild thickening at the Achilles tendon and some pain to palpation over the retrocalcanael bursal area. Dr. Evans recommended physical therapy and orthotics. (Tr. 791-92).

On August 31, 2012, Dr. Miller opined Plaintiff had not yet reached MMI. Dr. Miller recommended Plaintiff use his brace and cane, avoid stairs, squatting, and climbing, and limit himself to a regimen of 30 minutes of standing and/or walking and 30 minutes of sitting. (Tr. 792).

Dr. David Volarich, a state agency consultant, conducted a physical examination of Plaintiff and records review on August 8, 2013. Plaintiff continued to experience ongoing difficulties such as pressure around his left Achilles and swelling and pain in his heel. His symptoms increased with weightbearing but improved after soaking in hot water. He wore thick-heeled footwear and

orthotics.  Plaintiff could walk up and down steps slowly in a normal reciprocating fashion while using a handrail, but avoided them if possible.  He found it difficult to navigate uneven ground because he had a hard time balancing.  He could kneel and squat without much difficulty, but standing in one place for more than fifteen minutes increased his pain.  He could walk for about 45 minutes before his symptoms became severe.  Plaintiff tried to walk a mile several times a week for exercise.  Plaintiff cared for himself and could perform housework without much difficulty as long as he paced himself and avoided standing for long periods.  His did not have difficulty going to or staying asleep.  He could no longer go fishing, travel, or play ball with his nieces and nephews because of his ankle.  Plaintiff could drive.

On examination, Plaintiff demonstrated symmetric bulk, tone, and strength in the upper extremities.  He had symmetric bulk in the lower extremities and his strength in the hip girdles, quadriceps, and hamstrings were all strong bilaterally at 5/5.  His right calf was strong to both dorsiflexion and plantarflexion at 5/5.  His left calf was strong to dorsiflexion at 5/5 but plantarflexion was weak at 4/5.  Plaintiff could walk barefoot and flat foot.  He demonstrated a slight limp favoring the left lower extremity, but this improved as he moved back and forth several times.  He was able to toe walk but was weak in the left calf.  He could tandem walk without a problem and could heel walk with complaints of Achilles and heel pain.  Plaintiff stood on the right foot for ten seconds, but could only tolerate seven or eight on the left.  Plaintiff could squat fully and stand back upright to an

erect position without too much difficulty. Standing on the left foot alone caused discomfort in his left ankle and foot.

Plaintiff had full motion in the lumbar spine and elicited some minor discomfort at the sacroiliac joints bilaterally. Dr. Volarich found no spasms or trigger points. A straight leg raise was accomplished to 80 degrees bilaterally, where he stopped due to hamstring tightness. Raidcular symptoms were not elicited. Plaintiff had normal plantarflexion, inversion, and eversion ROM of the left ankle and 15/20 dorsiflexion ROM. His right ankle and foot were normal. Dr. Volarich diagnosed Plaintiff with a left ankle Achilles tendon rupture, a wound infection at the left Achilles repair, and back pain secondary to abnormal weightbearing.

Dr. Volarich opined Plaintiff would need ongoing care for his pain syndrome, using modalities such as narcotics and non-narcotic medications, muscle relaxants, and physical therapy. Plaintiff did not need additional surgery and was able to perform most activities of self-care.

Dr. Volarich advised Plaintiff to limit repetitive stooping, squatting, crawling, kneeling, pivoting, climbing, and all impact maneuvers. He should be cautious navigating uneven terrain, slopes, steps, and ladders and could handle weight to tolerance. Plaintiff should limit prolonged weightbearing, including standing or walkin.g to 30 to 45 minutes or to tolerance and should use appropriate padding if kneeling. Plaintiff should pursue an appropriate strengthening, stretching, and

ROM exercise program, in addition to non-impact aerobic conditioning. Plaintiff could work full duty to tolerance of the lower extremities. (Tr. 375-386).

Plaintiff saw Dr. Miller on October 11, 2012 and reported improvement. On examination, Plaintiff demonstrated good ROM of his ankle. (Tr. 783).

Plaintiff followed up with Dr. Evans on November 9, 2012. He continued to experience pain in the posterior aspect of his ankle. He had been working longer hours and he believed his job caused him more pain. Plaintiff had no tenderness with palpation over the Achilless but had marked tenderness over the retrocalcaneal bursitis. Dr. Evans advised him to wear his heel raises full time. Dr. Evans also prescribed Plaintiff Indocim and opined Plaintiff needed to be limited to eight-hour shifts. (Tr. 774).

Plaintiff saw Dr. Evans on December 12, 2012. His pain was somewhat improved, but he was on medical leave, not working, and taking Indocin. Plaintiff still had tenderness to palpation in the retrocalcaneal tubercle. Dr. Evans opined Plaintiff had 25% permanent disability and should have a job with "a sitdown type component." (Tr. 770). Dr. Evans completed a form that same day and listed Plaintiff's restrictions as "sit down employment." (Tr. 1428).

Plaintiff followed up with the VA on December 13, 2012. Plaintiff reported increased pain with his new job, which improved with reduced duties. Plaintiff demonstrated limited dorsiflexion ROM in his left ankle, 4/5 strength, and full and pain-free inversion and eversion ROM. (Tr. 769-70).

Plaintiff saw Dr. Evans on January 14, 2013 and continued to complain of pain in his left heel. He stopped taking his indomethacin because it was not helping. Dr. Evans noted tenderness to palpation medially and laterally and in the area of the retrocalcaneal bursa. Dr. Evans recommended physical therapy and prescribed Plaintiff prednisone for inflammation. He again recommended Plaintiff "have a sit down type of employment." (Tr. 764).

On January 24, 2013, Dr. Evans completed a medical source statement, indicating that Plaintiff had continued problems with his Achilles tendon, which were exacerbated by prolonged walking or standing. Dr. Evans opined that Plaintiff should have a sedentary-type occupation. (Tr. 1429).

Plaintiff followed up with Dr. Evans on February 19, 2013 with pain in his left heel. An MRI showed thickening of the Achilles' tendon as expected, along with retrocalcaneal bursitis. On examination, Plaintiff had mild swelling and tenderness over the bursa. Dr. Evans instructed Plaintiff to continue physical therapy, wear elevated heels and shoes that do not cause pressure on his heel, and avoid prolonged walking or standing because of pain. (Tr. 828).

Plaintiff followed up with Dr. Evans on May 22, 2013 with decreased swelling and tenderness of his Achilles' tendon. Dr. Evans noted that Plaintiff continued to be disabled from his job and could not do vigorous activities. (Tr. 811).

## Analysis

Plaintiff argues the ALJ's RFC assessment was erroneous. An RFC is the most a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The

ALJ must consider all of the relevant evidence when determining a claimant's RFC. *Id.* On review, "the court will uphold the ALJ's decision so long as it is supported by substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

The ALJ, here, found that Plaintiff had the RFC to perform light work, except that he was also limited to two hours of standing/walking; had to avoid ladders, ropes, and scaffolds; could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and had to avoid concentrated exposure to extreme vibration. (Tr. 14).

Plaintiff advances several arguments against this RFC assessment. He posits the ALJ "played doctor" in analyzing the medical evidence; "cherry-picked" from the record; erroneously disregarded a state agency consultant's opinion; erred in assessing Plaintiff's complaints of pain; and impermissibly discredited the testimony of Plaintiff's sister.

An ALJ "plays doctor" when he substitutes his own lay opinion for that of a medical professional by either rejecting or drawing medical conclusions without relying on medical evidence, *Back v. Barnhart*, 63 F. App'x 254, 259 (7th Cir. 2003), or failing to address relevant medical records, *Dixon*, 270 F.3d 1171, 1177-78 (7th Cir. 2001). ALJ Heimann did not commit these errors here.

ALJ Heimann gave "great weight" to the opinions of Dr. Evans, Plaintiff's treating orthopedist, who limited Plaintiff to "sit-down" and "sedentary" employment. The ALJ also relied on Plaintiff's work conditioning evaluation,

which demonstrated Plaintiff could complete a variety of tasks, including a 30 minute walk with an occasional three minute jog at 2.8 miles-per-hour with a two percent incline, lifting 55 pounds frequently at all levels, and repetitive ramp climbing, stair climbing, shoveling, and push/pull tasks. (Tr. 16). Although no doctor specifically opined Plaintiff could tolerate up to two hours of standing, Plaintiff's capacity to stand/walk during a workday is not a medical conclusion that necessitates expert opinion; the Regulations clearly state that the RFC assessment is an issue reserved to the Commissioner. 20 C.F.R. § 404.1546(c). Moreover, an ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007).

Plaintiff contends, however, that the ALJ omitted several treatment notes from Dr. Evans' records that support a more limited RFC. Namely, in December 2012, Dr. Evans noted Plaintiff's symptoms improved while he was not working; in February 2013, Dr. Evans stated Plaintiff should avoid prolonged standing and walking; and in May 2013, Dr. Evans wrote that Plaintiff continued to be disabled from his job and could not do vigorous activities. These notes are not contrary to the ALJ's conclusions. The ALJ acknowledged Plaintiff was unable to return to his prior employment and had limitations with standing. An ALJ need not mention every piece of evidence as long as he does not ignore an entire line of evidence contrary to his ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Plaintiff further asserts the ALJ drew impermissible inferences from Dr. Evans' opinions. Dr. Evans did not set forth any restrictions beyond "sedentary" and "sit-down" work. Plaintiff posits that the ALJ erroneously inferred that Plaintiff had no lifting restrictions based on Dr. Evans' "silence" on the matter. This is not the case. As an initial matter, the ALJ did limit Plaintiff's lifting requirements by determining he was capable of light work, which involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Moreover, Dr. Evans was Plaintiff's treating orthopedist and the ALJ appropriately gave his opinion great weight. Dr. Evans completed multiple medical source statements where he had the opportunity to include lifting restrictions, but did not. Dr. Evans did not mention anywhere else in his treatment notes that Plaintiff had lifting restrictions. The ALJ merely adopted the recommended restrictions from Plaintiff's treating physician, which is more than permissible. Plaintiff fails to point to anything in the record that supports a more restrictive RFC than what he found. The work conditioning reports show Plaintiff was able to lift 55 pounds and Dr. Volarich opined Plaintiff could handle weight to tolerance. The ALJ adequately accounted for Plaintiff's lifting restrictions in the RFC.

Plaintiff next argues the ALJ should not have assumed that Dr. Evans' opinions related to full-time, rather than part-time, employment. Nothing suggests Dr. Evans meant to opine Plaintiff was capable of only sedentary part-time work. "In analyzing an ALJ's opinion for such fatal gaps or contradictions,

we give the opinion a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

Plaintiff further argues the ALJ erroneously rejected Dr. Volarich's opinion that Plaintiff should be limited to 30 to 45 minutes of weightbearing. An ALJ is only required to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). ALJ Heimann offered several reasons for not incorporating Dr. Volarich's weightbearing limitation. He opined that "claimant's performance on work hardening evaluations, taken with his activity level subsequent to this that included walking around campus at school and being involved in volunteer work are inconsistent with such extreme limitations in standing and walking."[4] (Tr. 18).

The ALJ's vague references to Plaintiff's volunteer work and ability to walk to class are insufficient to discredit Dr. Volarich's opinion. A claimant's activities of daily living (ADLs) are not reliable indicators of his or her ability to maintain full-time employment. "The critical differences between [ADLs] and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Moreover, there is virtually no evidence of

---

[4] Plaintiff also argues the ALJ erroneously used Dr. Evans' opinions to discredit Dr. Volarich's opinion. The record, however, does not support this position and the Court will not further address it.

how long Plaintiff remained weightbearing while performing these activities. Thus, it was improper for the ALJ to draw a negative inference from the record without further developing the evidence. *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014).

Remand, however, is not warranted just because the ALJ's decision is imperfect. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ properly discredited Dr. Volarich's opinion because it was inconsistent with Plaintiff's work conditioning evaluations. *See* 20 C.F.R. § 404.1527 (An ALJ may give less weight to a medical opinion if it is inconsistent with other portions of the record). Plaintiff, though, argues the ALJ cannot use the work conditioning reports to reject Dr. Volarich's opinion because the ALJ refused the therapist's conclusion that Plaintiff could return to his prior work as a custodian. Plaintiff's argument misses the mark. Just because the ALJ rejected the therapist's ultimate opinion does not mean the ALJ had to also reject the evidence from which that opinion derives. The ALJ reached his own logical conclusion that Plaintiff's performance during work conditioning was inconsistent with Dr. Volarich's opinion related to weightbearing.

Plaintiff next argues the RFC assessment was erroneous because the ALJ failed to properly consider the effects of Plaintiff's back pain. The Regulations require an ALJ to consider several factors when assessing a claimant's allegations of pain, including the nature and intensity of pain, precipitation and aggravating factors, dosage and effectiveness of pain medications, other treatment for pain relief,

functional restrictions, and the claimant's activities of daily living. 20 C.F.R. § 404.1529.

Here, the ALJ recognized Plaintiff's ongoing complaints of worsening back pain and took into account Plaintiff's conservative treatment, which included physical therapy, an anti-inflammatory medication, and a muscle relaxant. (Tr. 18). Notably, the ALJ acknowledged that Plaintiff refused strong narcotic medications due to his history of substance abuse. The ALJ further mentioned Plaintiff's MRI that demonstrated a bulging disc and degenerative disc disease, chiropractor visits, epidural injections, and prescriptions for a cane and a TENS unit. Ultimately, however, the ALJ found that Plaintiff's back pain was not debilitating because his symptoms improved over the course of his treatment, he no longer required assistive devices to ambulate, he only took ibuprofen, and he only occasionally used his TENS unit. (Tr. 19). The ALJ was also persuaded by Plaintiff's ability to occasionally sweep and vacuum floors, work at the adult daycare, and attend college. (Tr. 19-20). Plaintiff does not point to any evidence the ALJ ignored and the Court cannot say that the ALJ's conclusion was illogical or unsupported. On review, this Court does not reweigh evidence or substitute its own judgment for that of the Commissioner's. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). ALJ Heimann sufficiently addressed the evidence in the record and "minimally articulated" the reasons for his findings. *Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008) (internal quotations omitted).

Finally, Plaintiff asserts the ALJ erred in evaluating the testimony of Plaintiff's sister, who stated Plaintiff's pain was all encompassing and comprehensive on a physical and emotional level. The ALJ rejected this testimony because of the "close relationship" between Plaintiff and his sister, her lack of medical expertise, and the lack of supporting evidence in the record regarding Plaintiff's emotional issues. Plaintiff asserts the ALJ's analysis consists of pure conjecture. However, the ALJ accurately pointed out that the record indicates Plaintiff was doing relatively well from a mental health standpoint. Moreover, as the ALJ states, Plaintiff's testimony and his sister's testimony were essentially redundant. The Seventh Circuit has opined an ALJ cannot ignore an entire line of evidence, but third-party testimony does not constitute an entire line of evidence when it serves to "reiterate, and thereby corroborate, [the claimant's] own testimony . . ." *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996). Thus, to the extent the ALJ found Plaintiff's testimony not fully credible, he also found the sister's testimony not credible as well.

For the reasons set forth above, Plaintiff has failed to show that substantial evidence does not support the ALJ's disability determination. The ALJ adequately discussed the record and provided a logical bridge between his conclusions and the evidence.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

IT IS SO ORDERED.

DATE:  July 12, 2018.


                **s/ Clifford J. Proud**
                **CLIFFORD J. PROUD**
                **UNITED STATES MAGISTRATE JUDGE**